Caruthers, J.,
delivered the opinion of the Court
The complainants are the common school commissioners of the 8th civil district of Polk county, and in that character filed this bill on the 13th of February, 1856, tto impeach and set aside a lease for ninety-nine years, made by their predecessors, of the common school section of land in that district, as well as a sale made of the same, under the order of the Circuit Court of that county, by virtue of both of which the defendants claim title.
The land is poor and broken, and almost worthless for purposes of cultivation, but has become of immense value on account of the discovery of copper ore upon it. These mines have been developed, and are now worked with great profit by the defendants. The property is supposed to be now worth several hundred thou *174 sand dollars, perhaps half a million. The veins of copper ore upon it are exceedingly rich, and regarded as almost inexhaustible.
In immediate proximity, if not upon this land, discoveries had been made before the lease or sale, and the surface indications were such, as to leave but little, if any doubt, that it was a prize worth contending for. Consequently, schemes were ingeniously set on foot and carried out, to obtain title to it. It could hardly be expected, under such circumstances that the watchfulness and care of uninterested commissioners would be much protection to a treasure so attracting, against the avidity of speculators. The deep interest of the infants of the present and future generations, in these mines of wealth, was not sufficient to excite their trustees to that degree of vigilance in their trust which was necessary to resist the schemes and machinations of those who were in eager pursuit of the glittering prize.
But the question now is, whether the present complainants, who have succeeded to the trust, can reclaim the lost treasure. This must depend upon the law of the case operating upon the facts which have transpired.
The territory which composes the State of Tennessee was ceded to the general government by the State of North Carolina, upon certain conditions specified in the deed of session, and accepted by Congress in 1789. One of these was, that a certain portion of the lands should be set apart for educational purposes. Congress, by act of 1806, ch. 31, ceded to Tennessee all the unappropriated land north and east of a certain line then established, and afterwards called the “ Congressional reservation line,” because all the lands on the south and west were re *175 served from entry, and exempt from any claim by Tennessee. The lands ceded embraced all East Tennessee, and a large portion of the Middle Division of the State. But this cession was upon the express condition that 100,000 acres should be set apart for colleges, and the same quantity for acadamies, and also 640-acres in every six miles square, or one section in each township, “ for the use ef schools for the instruction of children forever.” The legal title passed to the State, with the positive restriction that one section should be laid off and held for schools. The right vested in the State, as a corporation, coupled with a trust. In Lowry v. Francis, 2 Yer., 534-41, it was held, that these lands could not be sold, and that the various acts authorizing that to be done, were unconstitutional, being in violation of the compact with the general government of 1806, by which they were to be held by the State for the “ instruction of children forever.” This case settled that the State was only a trustee in relation to these lands, bound by the restrictions of the act of Congress, and that the children of the respective townships were the beneficiaries. In Perkins and Chilcutt v. Reed, 1 Swan, 87, it was held, “that both the State and commissioners are mere trustees for the common schools of the township.”
Congress, however, by the act of 1843, ch. 346, authorized the State to convert the school lands into a fund for the support of schools, by sale, provided the consent of the inhabitants should be first obtained. By the 2d section of this act, if the Legislature should deem it inexpedient to sell, provision might be made for leasing for any term “-not exceeding four years.”
*176 Our Legislature, by act of 1844, ch. 104, amended by that of 1846, ch. 121, made provision for the sale of the common school lands, in pursuance of the power given by the- act of Congress of 1843 above cited. A vote of the people is to be taken upon the question of selling, and if a majority fail to vote, a commissione'-may be appointed by the County Court to ascertain the will of the people by personal application to each voter for his signature to a paper properly headed for that purpose; and if it appears by either mode that a majority of the qualified voters of the township are in favor of the sale, that fact is to be certified to the Circuit Court, and it is made the duty of the- Judge to order a sale on the terms prescribed. Before the sale is made, the lands are to be valued, and are not to go for less. By a proceeding under these acts, the land in question was sold on the 25th of July, 1850, by the clerk, ' to Euclid Waterhouse and others, for ¡$1,710, that being the highest and best bid. It was certified to the Circuit Court of Polk county, at its February Term, 1850, that it was ascertained by the report of a commissioner appointed for that purpose, that a majority of the voters were in favor of the sale; and the order to soil was then made. The sale not having been made for some reason, the order was renewed at the June Term, and executed on the 25th of July, 1850, as stated.
On the 4th of February, 1850, before the order of sale by the Court, but after the vote of the people, the Legislature enacted, ch. 181, § 5, that the common school commissioner of “Polk county” should have power to lease, for mining purposes, any unsold school lands, on such terms as in their judgment would be most condu- *177 eive to the interest of tbeir common schools. In May, after the decree for the sale in the preceding February, the commissioners made a lease of this land to Caldwell and Symons for ninety-nine years, in the supposed pursuance of the power given them by the last act. Whereupon these lessees filed a bill in the ^Chancery Court to enjoin the sale under the order of the Circuit Court, and the injunction was granted so far as such sale might or could affect their lease. On the day of sale, this lease and injunction were read to the people,, and the land was sold upon that notice. These facts were all reported to the Court; and no exceptions being made, the report was confirmed at the October Term, 1850.
Soon after this, the purchasers sold the land at a-large advance, and assigned their certificate of purchase-to Charles Congden and associates, of New York, through-their agent, Samuel Congden, there upon the ground^ and having full knowledge of- all the facts. The said Charles Congden having paid the original purchase money, ¡$1,770;, and holding the certificate of' purchase by assignment^ obtained a grant from the State on the-23d of February, 1853. The first purchasers made no warranty of title, notwithstanding the large advance made on their bid by Congden. The bills and cross-bills between the lessees and purchasers were all compromised and settled by the purchase of the lease by Congden. Having thus concentrated in himself both titles, an act of incorporation was procured from the Legislature, and the property passed over to the “ Tennessee Mining Company,” consisting of the said Charles-Congden and some other stockholders, by whom it has-. *178 been put into successful mining operation, and is now, and has for several years been worked on a large and profitable scale, as one of the celebrated “Duck Town Copper Mines.”
Two preliminary objections are made to the relief sought in the bill:
First. That this is a bill of review, and consequently is barred by the lapse of three years from the confirmation of the sale in the Circuit Court. We do not consider it a bill of that character. Its object is to impeach and set aside the proceeding entirely, and not to review and correct it. It assumes that the sale was not only erroneous, but void. The jurisdiction given to •the Circuit Court in the case is not so much judicial as ministerial. There are no pleadings, no questions for adjudication, no power to decide upon the propriety of selling, or the terms of sale, or even the minimum to be fixed; all this is done under the. statutes by other machinery. It is more like the jurisdiction to condemn land to be sold for taxes, upon the report of a collector, than a suit. If it be certified to him, that the sense of the people has been ascertained in either, of the modes prescribed, and that a majority are for the sale, it is made the duty of the Circuit Judge to order it without question; and confirmation would be a matter of course, unless something should have occurred in making it that would render it improper. He is not even required to pass the title by decree; that goes by the certificate of purchase, upon which a grant is to be issued when the consideration is paid. Such are the provisions of the statutes referred to. The legality of he sale must depend upon the circumstances attending *179 it, and the conformity of the previous steps to the requirements of the statutes. The Circuit Judge would doubtless have power to set aside the sale for good cause; but a failure to do so does not close the question as an adjudication, as in ordinary suits, unless opened by a bill of review, or other prescribed mode of proceeding in the regular practice. The validity of the title procured • must still depend upon the facts of the case.
• Second. It is contended that the grant of the State closes all questions, and cures every imperfection in the anterior proceedings, and is conclusive upon the title. It is a general rule that the State’s grant of her own lands cannot be questioned ’upon any matter behind it, by any one whose interest or claim originated subsequently. But a grant may be set aside in favor of an older special entry upon which a younger grant has issued. Here there was an older claim — the land had been legally set apart for common schools, and vested in commissioners for that purpose. And, besides, this land did not belong to the State, but was only held in trust. There are two grounds, then, upon which this case is distinguished from those to which ■ the rule referred to applies.
These difficulties being out of the way, the case is open to investigation upon its merits. And the questions presented are, whether the sale under the order of the Circuit Court was good in law, and sufficient to pass the title; and if not, whether the lease was valid and binding upon the complainants.
1. As to the sale. Various objections are made in the bill, and perhaps sustained by the proof, in relation *180 to the mode and manner of obtaining the sense of the people on the question of sale, and to the qualification of the voters. We need not now determine whether these can be examined, as they preceded the order of sale, but a reference to them is enough to excite strong suspicion that all was not fair, and that much undue influence and exertion were used to divert this bounty of the general government from the laudable purposes designed, and appropriate it to individual uses. It appears that men were employed to canvass the district, for the purpose of making public and private speeches to convince and persuade the people to vote for the sale. But independent of this, enough appears to render the sale and the title derived from it null and void. There wras no law authorizing the sale of school lands already leased. It is no sufficient answer to this objection that the lease was invalid, if such was the fact. A Court of Chancery had so fa,r recognized it as to enjoin the sale. True, the Circuit Court had ordered the sale in February, but in May the commissioners had so far changed their purpose as to grant a long lease, and the Chancellor had forbidden the sale upon that ground. If the Clerk of the Circuit Court, under these circumstances, went through the forms of a sale, it was nothing more than a form, and could have no effect upon the title so as to change it. It was a fraud upon unborn infants, and cannot be allowed to deprive them of their rich inheritance. The purchasers, with a full knowledge of these facts, could claim nothing by their purchase, nor transmit any right to others by a transfer of the certificate of purchase. There is no pretence but that these facts were all well known to the Congdens at the *181 time of their purchase, and that this knowledge would equally affect them and .their associates, as corporators as well.as individuals. It was a flagrant breach of trust on the part of all concerned, and cannot be permitted to stand. That the Circuit Judge would confirm a sale made under such circumstances can only be accounted for on the ground that it was regarded as a matter of course, uncontested proceeding to which his attention was not directed.
But after a brief contest in the Chancery Court between the .lessees and purchasers, in which each impeach and declare void the claim of the other, they fall into a harmonious arrangement, by which the lease is sold and transferred to the purchasers, and the two claims are united in “ Congden and associates,” and pass to the new corporation called the “ Tennessee Mining Company.” So it is contended, that if their title is not in fee under the sale and purchase, it is good for ninety-nine years under the lease. This position we consider equally unavailing, and less plausible than the other.
It is true, that by the act of February 4, 1850; ch. 181, sec. 5, the Legislature authorized the commissioners .to lease for mining purposes any “unsold” school land in Polk county, and that this land was then unsold. But the defendants assume that all the power of the people, at the instance of the commissioners, had then been exerted, under the acts of 1844 and 1846, in favor of a sale, and that the same was conclusively and legally settled — nothing remaining to be done sbut to carry out the will of the inhabitants of the district, by a matter of course order of the Circuit Court, and a formal sale by its clerk. Could the act be construed to apply to such a *182 case? Was it intended to set aside the decision of the people in favor of a sale, upon the judgment of the commissioners in favor of the policy of leasing? .It is a little suspicious that the Legislature should have thought it proper to change the general policy settled in 1844 and 1846 in relation to a sale of the common school lands, and to pass this special and pointed act in relation to leasing at that particular time; and still stranger that these commissioners should have changed their views so suddenly, and adopted a course directly yn conflict with the will of the people so recently expressed upon their motion. But all that is immaterial. They had no power to make such a lease under any law. Waiving the objections just stated, based upon the assumptions of the defendants in support of their title under the sale, the lease is void for want of authority of law. The act of Congress of 1843, ch. 346, did, in case the Legislature should deem it inexpedient to sell, authorize provision to be made for leasing for any term “ not exceeding four years.” Our act of February, 1850, authorizes the lease, but prescribes no term. The Legislature, acting under a trust, would be bound by its restrictions, and could not disregard them. But that is *not attempted by the act, but only by the commissioners. The lease, then, for ninety-nine years, being in contravention of the act of Congress, is void, and confers no rights upon the defendants.
The result of the whole case is, that the title is still in the complainants, as common school commissioners, for the benefit of the children of District No. 8 of Polk county “for ever;” and that the defendants will be held to account for all the net profits made by them out of the said mines, or as renters, at the option of complain *183 ants; tbe election to be made after tbe taking of tbe account in both aspects. A decree will be drawn up to this effect, and tbe case remanded to tbe Chancery Court for the stating of tbe account and final proceedings.